

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00175-CV

_____

IN THE INTEREST OF B.K. AND A.K., CHILDREN

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-693249-20

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

After a bench trial, the trial court found by clear and convincing evidence that (1) Appellants Mother and Father engaged in conduct or knowingly placed their daughters Bella and Amelia (collectively, the girls) with persons who engaged in conduct that endangered the girls' physical or emotional well-being; (2) Mother and Father knowingly placed or knowingly allowed the girls to remain in surroundings or conditions that endangered their emotional or physical well-being; and (3) termination of the parent-child relationships between Mother and the girls and between Father and the girls was in the girls' best interest.[1] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2). In three issues, Father complains that the evidence is legally insufficient to support the endangerment findings against him and that the trial court abused its discretion by denying a continuance or extension and by admitting testimony over objection. In one issue, Mother contends that the evidence is legally and factually insufficient to support the best-interest finding against her. Because we hold that the evidence is sufficient to support the challenged findings and that the trial court did not reversibly err, we affirm the trial court's judgment.

---

[1]We use aliases to refer to the girls, their family, and their foster parent. *See* Tex. R. App. P. 9.8(b)(2) (requiring courts to use aliases to refer to minors in parental-rights termination cases and, if necessary to protect the minors' identities, to also use aliases to refer to their family members); *see also* Tex. Fam. Code Ann. § 109.002(d).

# I. BACKGROUND LEADING TO THE 2019 REMOVAL

The Texas Department of Family and Protective Services (the Department) had been in the family's lives since Bella was an infant. Bella was eight years old, and Amelia was six years old at the time of trial. Although other elements of parental misconduct contributed to the Department's chronic presence—namely, drugs and failure to treat diagnosed mental illness—domestic violence was the Department's chief concern.

In the summer of 2013, the Department received a referral alleging that Mother and Father were neglecting and physically abusing Bella. Because of domestic violence, a Family-Based Support Services (FBSS) case was opened, and the Department placed Bella with her paternal grandmother (Grandmother). Later that same year, the Department received another referral alleging neglectful supervision and physical abuse of Bella. The parents had allegedly hit each other in a moving car in Bella's presence. The Child Protective Services (CPS) investigator spoke with Mother about her admitted marihuana use and about her not taking her bipolar medication. The investigator talked to both parents about the ongoing domestic violence. The Department offered the parents FBSS services, and Bella was back in her parents' care by the spring of 2014.

In September 2015, when Amelia was several months old, the Department received two referrals alleging neglectful supervision of the girls. The first referral alleged that Mother and Father physically fought often, that Father pulled Mother by

her hair in the girls' presence, that Mother had slashed his tires, that Mother and Father smoked marihuana daily in the girls' presence and could be using cocaine or crack, that they sold their food stamps, that the home's electricity had been turned off, that the home had very little furniture, and that trash littered the floor throughout the home. When the CPS investigator visited the family, Mother stated that she would spend that night in jail because she was going to go assault Grandmother, whom she suspected of making the referral. Mother also told the investigator that she did not believe she needed to address her mental health issues. Mother admitted smoking marihuana often when the girls were in another room or with their grandmother and admitted to using ecstasy a few days earlier with Father. Mother also admitted slashing Father's tires but said that it had been during the last case, more than a year earlier. Father admitted using marihuana habitually and to using ecstasy. He also admitted that he was not taking any medication for his bipolar disorder.

Even though the investigator and parents discussed the concerns about ongoing domestic violence in the girls' presence, that same day the parents screamed at each other and at Grandmother in the investigator's presence. At some point, Father, who was carrying the girls, accidentally hit Amelia's head on the door frame. He also tried to give the girls to the investigator to place in foster care.

The investigator placed the girls with Grandmother that day. However, the second referral, received only days after the first, alleged that Grandmother could no longer care for the girls, partly because she did not want her marihuana-smoking

husband to move out, which had been a Department condition for her keeping the girls.

The Department therefore removed the girls in September 2015 and filed a petition seeking termination. The girls were placed in foster care for about four months, and then they were placed with a relative. The trial court extended the case's dismissal date while the parents completed their service plans and ordered a monitored return thirteen months after the removal. In mid-February 2017, more than sixteen months after the girls' removal, the trial court signed a final order naming the parents permanent managing conservators of the girls and removing the Department as a conservator.

One month later, on March 15, 2017, the Department received another referral. That referral alleged domestic violence between the parents and between Mother and Grandmother. On March 31, 2017, the Department filed another termination petition, and the girls were again placed in foster care.

By the end of January 2018, the parents were again complying with their service plans, so the Department moved for a monitored return of the girls to their parents, and the trial court ordered it in early February 2018. In early June 2018, more than fourteen months after the girls' second removal, the trial court signed a final order naming the parents permanent managing conservators of the girls and removing the Department as a conservator.

About five months later, in early November 2018, the Department received another referral alleging domestic violence between the parents in the girls' presence, drug use, and mental health concerns. The FBSS case opened in early February 2019. Mother admitting to using marihuana, so FBSS required her visits with the girls to be supervised. The girls lived with Father. Father admitted that he allowed Mother to visit the girls unsupervised, so the Department began supervising the visits.

By July 2019, the parents had barely begun the FBSS services. In November 2019, while the FBSS case was still open, the Department received another referral. This one alleged that Mother hit Father in the head with a golf club. Father obtained a 90-day protective order against Mother. He confirmed to the Department that the incident had occurred. The children were present during the assault. It occurred in the family home, where Mother was not allowed under the FBSS agreement.

The Department filed the underlying petition for termination on December 19, 2019. The trial court placed the girls with a family member over the Department's objection; ten weeks later, they were removed from her and placed in foster care. Except for a period of transitional care for Bella, her hospitalization, and Amelia's six hospitalizations, the girls remained with Ms. Foster from the end of February 2020 through the end of trial.

Within ten days of the filing of the petition, the trial court ordered the parents to comply with every requirement in their Department service plans. As of June 30, 2020, the trial court found that the parents had "not demonstrated adequate and

appropriate compliance with the[ir] service plan[s]." By mid-October 2020, however, the trial court found that they had. At the end of that month, Father filed a motion to retain the suit on the court's docket and to set a new dismissal date, and he amended his motion in mid-November 2020. The trial court granted that motion, setting the trial for April 5, 2021.

In March 2021, the trial court again found that the parents were complying with their service plans and reset the trial for May 4, 2021. Less than a week before the trial date, Father filed a "Motion to Retain Suit on Court's Docket Pursuant to Supreme Court Emergency Order" and "Motion for Additional Temporary Orders to Amend Family Service Plan to Include Court Ordered Family Therapy." In the hearing on the motions, the girls, represented by the same attorney ad litem who had represented them in the previous case, opposed the motions. The trial court denied the motions, held the trial, and terminated the parent-child relationships between the girls and their parents. Both parents appealed.

## II. DISCUSSION

Because they could result in rendition, we first address Father's second issue challenging the legal sufficiency of the evidence supporting the endangerment findings against him and the portion of Mother's sole issue challenging the legal sufficiency of the evidence supporting the best-interest finding against her. *See CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 99 (Tex. 2000); *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999); *In re K.W.*, 138 S.W.3d 420, 428 (Tex. App.—Fort

7

Worth 2004, pet. denied). For ease of discussion, we interweave our discussion of Mother's factual-sufficiency complaint with her legal-sufficiency complaint. We next address Father's first issue complaining about the denial of a continuance and extension before concluding with his third issue complaining about the admission of evidence.

## A. Sufficiency Of The Evidence

### 1. Standards of Review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy one ground listed in Texas Family Code Section 161.001(b)(1); and 2) that termination is in the children's best interests. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged findings—here, the endangerment findings against Father and the best-interest finding against Mother—to determine whether a reasonable factfinder could form a firm belief or conviction that each finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *see* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2). We assume that

8

the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *J.P.B.*, 180 S.W.3d at 573. We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them or the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that the termination of the parent–child relationships between Mother and the girls would be in the girls' best interests. Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## 2. Endangerment

In the statement of his second issue, Father globally challenges the sufficiency of the evidence to support termination. The only findings he challenges in the discussion, however, are the endangerment findings against him. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E).[2] Father summarily complains that no evidence supports the endangerment findings:

> The evidence was insufficient to terminate [Father's] parental rights. The evidence was insufficient to prove the grounds for terminations as set for [in the] Texas Family Code [§ 161.001 ](b)(1)(D) and (E). Specifically, there was no evidence proven under the clear and convincing standard that [Father] ever placed the children in danger or allowed them to remain in [a] dangerous placement. Clerk's Record and Transcript, generally.

The remaining three paragraphs of Father's discussion of the sufficiency issue address not the evidence pertinent to the endangerment findings but the evidence supporting his compliance with his service plan. The trial court did not find that Father had failed to comply with his service plan. *See id.* § 161.001(b)(1)(O).

### a. Endangerment Law

As this court has often discussed,

---

[2]Appellate courts are bound by unchallenged findings supporting termination. *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *5 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.); *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.). We are therefore bound by the unchallenged best-interest finding against Father. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *In re A.N.H.*, No. 04-15-00256-CV, 2015 WL 4932558, at *2 (Tex. App.—San Antonio Aug. 19, 2015, no pet.) (mem. op.).

Endangerment means to expose to loss or injury, to jeopardize. The trial court may order termination of the parent–child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone . . . . As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

Additionally, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct jeopardizing the child's physical or emotional well-being . . . . [E]ven if a parent makes dramatic improvements before trial, evidence of improved conduct, especially of short[ ]duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices.

*In re L.E.M.*, No. 02-11-00505-CV, 2012 WL 4936607, at *2–3 (Tex. App.—Fort Worth Oct. 18, 2012, no pet.) (mem. op.) (citations and internal quotation marks omitted). "Domestic violence, want of self[-]control, and propensity for violence may be considered as evidence of endangerment," *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *In re M.S.*, No. 02-20-00147-CV,

11

2020 WL 6066400, at *4 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.), as may children's witnessing domestic violence, *In re R.A.*, No. 02-18-00185-CV, 2018 WL 5832148, at *10 (Tex. App.—Fort Worth Nov. 8, 2018, no pet.) (mem. op.). Similarly, evidence of criminal conduct (including drug-related conduct), convictions, imprisonment, and a propensity for violence (including domestic violence) can demonstrate a parent's awareness of an endangering environment under Section 161.001(b)(1)(D). *In re A.S.*, No. 02-19-00422-CV, 2020 WL 990028, at *4 (Tex. App.—Fort Worth Mar. 2, 2020, no pet.) (mem. op.); *In re A.M.*, No. 02-19-00023-CV, 2019 WL 3334420, at *9 (Tex. App.—Fort Worth July 25, 2019, no pet.) (mem. op.).

### b. Endangerment Evidence

Father had a history of incarcerations for violent crimes, illegal drug use, and domestic violence with Mother before the Department returned the girls to him and Mother in the two prior cases. During the current case, even though he tested positive for cocaine, methamphetamine, and marihuana at one point and positive for marihuana as late as four months before trial, the Department's main concern was the domestic violence between Father and Mother and its impact on the girls. In fact, domestic violence had triggered all the girls' removals from their parents.

The removal in this case stemmed from Mother's hitting Father with a golf club. At trial, Mother put the assault in context. She testified that she and Father had an "altercation," but she could not remember what about. She claimed that for three

days, he trapped her and the girls in his home; under the parents' agreement with FBSS, Mother was not allowed in the home. Mother testified that she and the girls left the home during that three-day period only when they accompanied Father to visit Grandmother. On that visit, he slapped Mother and hit her in the face with his fists. During the three days, he "slapp[ed her] around, and stuff like that." On the last day, Father departed the home with Mother's cell phone, leaving her with the girls. She followed him outside and downstairs, asking for the phone. She stated, "And he came [and] rushed me back upstairs, and that's when he came at me. And I just—I was scared, and I just swung the golf club." Mother was five feet, four inches tall; Father was six feet tall and weighed at least twice as much as Mother. Mother testified that the grand jury no-billed her charge for aggravated assault with a deadly weapon after learning that Grandmother gave her the golf club to defend herself against Father.

Father admitted taking Mother's phone but denied holding her hostage for three days during which he beat her. He testified, "If she wanted to leave, she could leave." He stated that she jumped on his car. He admitted slapping her in a different incident.

Both parents testified about their violent history. Mother conceded that she and Father had been immersed in a cycle of violence for many years and that it had damaged the girls emotionally and psychologically. She admitted that the girls had learned to react with violence because they had seen it. Mother did not think it would be safe for her to live with Father and understood why the girls feared they might die

13

if they were returned home. She admitted that she could not protect the girls if Father turned on them and that they could not defend themselves. While Mother insisted that Father would not harm and had not harmed the girls, she conceded that what they had seen had harmed them.

Father admitted that he had been a very violent man throughout his life and specifically throughout his relationship with Mother. He admitted that he had endangered and traumatized the girls through his actions. He described one incident in which Bella sat on the couch, held her head, and stated that she could not do it or take it anymore and his simultaneous, related realization that his daughter had feelings. He also admitted that the girls had asked him to stop hurting their mother during some violent episodes and that he sometimes had stopped but other times, he had not. He conceded that it was not good for the girls to witness the physical and verbal violence between their parents and that because of his actions, they had "possibly" learned to act violently and could "grow up thinking that it's okay for a man to do them like that." He could see why the girls would be afraid of him and afraid to be returned to him, but he was surprised that they had claimed to have nightmares about their being returned home and then being killed.

Although Father admitted that he and Mother had had "a pattern of toxicity and violence," he contended that the girls could be safely returned to him because he and Mother had broken up and he did not have "any distraction." Father conceded that even though he and Mother had allegedly broken up in August 2020, they were

still not divorced, he gave her money, and they had had a public altercation less than a month before he testified.

Multiple other witnesses testified that Father's and Mother's domestic violence harmed the girls. Nastassia Hevener, who had been a Department investigator in the 2013 and 2015 cases but who evaluated the current case in December 2019 as a regional risk manager for the Department, testified that she recommended the current removal because the Department had "major concerns for the violence escalating" after Mother hit Father with a weapon in the girls' presence. Mother was not allowed to be in the girls' presence unsupervised when the assault occurred, but Father had ignored that directive. The Department therefore reasoned that Father was not protecting the girls. Hevener was concerned because the parents did not seem to have retained anything they might have learned from their previous services, and they were continuing to expose the girls to domestic violence.

Kenyatti Tricksey, a Department case manager over OCOK[3] cases and former conservatorship supervisor, testified that the ongoing family violence was not good for the girls and had not improved their mental health. She agreed that the family's domestic violence was getting worse. She also testified that the parents' actions had placed the girls in traumatic situations.

---

[3]As this court recently explained, "OCOK is a private provider of community-based care that contracts with the Department to provide foster care case management, kinship, and family reunification services in parts of the state, including Tarrant County." *Interest of M.M.*, No. 02-21-00153-CV, 2021 WL 4898665, at *2 n.4 (Tex. App.—Fort Worth Oct. 21, 2021, no pet.) (mem. op.) (cleaned up).

Michelle Hall, the family's most recent Department FBSS worker, testified that she began serving in that role in February 2019. She stated that "[t]here were concerns from teachers and day care that the[ girls'] behaviors were violent[ and that they were] starting to exhibit behaviors that they had maybe seen from their parents." Hall affirmed that the girls had suffered emotional and mental damage from their parents' domestic violence.

Gladys Demus, the OCOK caseworker for the preceding case and the current case, testified that the issue in the current case was the same as it was when she returned the girls to their parents the last time—domestic violence. She stated that the girls had been traumatized and mentally and emotionally damaged by their parents. Demus averred that in the latest incident, the girls had been very close to the action when Mother hit Father with the golf club, so close that blood got on their clothes. Demus also stated that the girls had told her that they are afraid that they will be killed if they are returned to their parents.

Demus agreed that only with this third case has the girls' psychological and emotional damage manifested itself. Demus testified that because the girls were getting older (Amelia was six and Bella was eight years old at trial), "their behaviors [were] coming out because of all the domestic violence." The girls told her that they show they love each other by fighting because they saw their parents behave that way.

Demus explained that Bella receives trauma therapy because

16

[s]ome of the things that have been going on between the mom and the dad, the violence, some of the things that she remembers. Like she stated that she has dreams of fighting or somebody trying to hurt her. She remembered, like, things that happened between her mom and dad.

She remembered the dad trying to leave and the mom jump[ing] on top of the car, and trying to get him to stop. They're fighting and yelling at each other. And those are some of the things that she explained to me.

Demus testified that Bella was afraid to go back home because she did not want her parents fighting with her around, and she did not want to go back only to be removed and placed in foster care again.

Demus also discussed Amelia's bad dreams, meltdowns, and multiple psychiatric hospitalizations in the last year. Demus reported that Amelia had threatened to hit Bella over the head with a golf club as Mother had hit Father, threatened to stab some other students at school, tried to jump out of the back of a car because she said Father had pushed Mother out of a car, and threatened to kill herself.

Finally, Ms. Foster testified that the girls were scared of their parents and told her they beat them. She also testified that the girls had dreams about their parents killing them.

### c. Resolution

Considering all the evidence detailed above, we hold it legally sufficient to support the trial court's endangerment findings against Father. *See* Tex. Fam. Code

Ann. § 161.001(b)(1)(D)–(E); *M.S.*, 2020 WL 6066400, at \*4; *A.S.*, 2020 WL 990028, at \*4; *J.I.T.P.*, 99 S.W.3d at 845. We overrule Father's second issue.

### 3. Best-Interest Finding Against Mother

In her sole issue, Mother challenges the legal and factual sufficiency of the evidence supporting the best-interest finding against her. *See* Tex. Fam. Code Ann. § 161.001(b)(2). She does not challenge the evidence supporting the endangerment findings against her. *See id.* § 161.001(b)(1)(D)–(E). We are therefore bound by them. *See, e.g., In re A.B.*, No. 01-16-00289-CV, 2016 WL 5110134, at \*5 (Tex. App.—Houston [1st Dist.] Sept. 20, 2016, no pet.) (mem. op.).

### a. Best-Interest Law

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may examine in determining the child's best interest:

(A)  the [child's] desires . . . ;

(B)  the [child's] emotional and physical needs[,] . . . now and in the future;

(C)  the emotional and physical danger to the child now and in the future;

(D)  the parental abilities of the individuals seeking custody;

(E)  the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)  the plans for the child by these individuals or by the agency seeking custody;

(G)  the stability of the home or proposed placement;

(H)  the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)  any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### b. Analysis

### (1) The Dangers Associated with Returning the Girls to Mother

The most compelling evidence of the girls' best interests is the unchallenged endangerment evidence against Mother because it allowed the trial court to find that

19

Mother had actively endangered the girls with her own violence, that she had failed to protect the girls from Father's violence in the past, and that an unacceptable risk existed that she would continue to endanger them with her own conduct and would continue to fail to protect them from Father. Generally, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). While such evidence is generally considered in evaluating the predicate grounds for termination, it is also relevant in determining whether a parent poses a present or future risk of physical or emotional danger to the child. *In re K.A.S.*, 131 S.W.3d 215, 229–30 (Tex. App.—Fort Worth 2004, pet. denied) (noting that trial court can measure future conduct of parents by their recent past conduct).

The evidence shows that Mother exposed the girls to danger and instability before their final removal by violating the Department's directive not to see the girls' unsupervised, by failing to remove the girls from harm's way when Father became abusive, and by engaging in physical violence against Father in the girls' immediate presence. The girls' emotional and psychological damage resulted from the endangerment caused by both Father and Mother.

The trial court also heard evidence upon which it could determine that the girls faced future endangerment risks if returned to Mother. Although both parents insisted that they had been separated since the summer of 2020, Bella was concerned that they were still together because they had lied to the Department about living

20

separately in the past and because she saw the same backgrounds during their separate Zoom visits held the month before trial began. Too, while Father testified that he had filed a petition for divorce in 2020, he admitted that then "the COVID happened," and he claimed that he could no longer afford a divorce. The trial court could have found significant the fact that Father and Mother were still married more than seventeen months after the third removal. *See In re A.H.*, No. 02-17-00222-CV, 2017 WL 5180785, at *11 (Tex. App.—Fort Worth Nov. 9, 2017, pet. denied) (per curiam) (mem. op.) ("The trial court could have believed that upon their release [from jail], [the parents] would remain a couple and [the m]other would again fail to protect a child from [the f]ather's violence.").

Finally, Father reported that a few weeks before trial, Mother accosted him in a public place after seeing him with another woman. The trial court could have properly found that Mother was unwilling to protect the girls by staying away from Father. Tying that finding to Mother's testimony that she could not protect either herself or the girls from Father, the trial court could have also properly found that Mother was unable to protect the girls from Father. This factor weighs in favor of termination.

### (2) The Girls' Desires

Even though there was evidence that the girls and Mother loved each other and were bonded, the girls did not want to even visit Mother and wanted to continue living with Ms. Foster, with whom they were placed at the end of February 2020. Bella liked having a bed (as opposed to a mattress) and enjoyed the stability. She was afraid

21

that another return home would end up with another round of violence and another foster-care placement. Both girls were afraid of their parents, afraid to visit them, and afraid to go home. They had nightmares "mostly about [Mother] killing them."

Ms. Foster testified that with her, the girls have a safe, stable home, and their own rooms, beds, and furniture. She testified that she and the girls were bonded and that they trust her.

This factor weighs in favor of termination.

### (3) The Girls' Present and Future Needs, Mother's and Ms. Foster's Parenting Abilities, and Mother's and the Department's Plans

The girls' only special needs centered on their mental health. The current caseworker, Demus, testified that although the girls sometimes behaved like typical children, their behaviors had escalated since the December 2019 removal. Eight-year-old Bella had had many behavioral issues: showing defiance, "acting out," and wanting to fight or hurt Amelia: "They would just be sitting, doing nothing. All of a sudden, she'd just grab [Amelia] by the hair and want to hurt her." Bella was hospitalized for mental-health issues. She was then placed in a respite foster home for a short period before returning to Ms. Foster's home, and things improved between the sisters.

Demus testified that six-year-old Amelia had begun having daytime enuresis and encopresis issues in September 2020 that had gotten worse. Amelia was

> having a really hard time. She[] had meltdowns at school, she[ was] having meltdowns in the foster home. She state[d] that, you know, she[ was] having bad dreams: monsters, fighting. . . . [S]ometimes she [would] just get[] upset, and she d[idn't] know why.

So she's been in the psychiatric hospital, I think, six times[ during this case]. She actually just got out on Wednesday [before Demus's Friday June 4, 2021 testimony].

Demus testified that "sometimes it [was] hard to bring [Amelia] down, to stop her from tearing up things." Although Demus testified that Amelia's breakdowns usually occurred right before or right after a visit with her parents, Demus also recounted the circumstances of Amelia's last breakdown. On the Saturday before Demus's testimony, Amelia had wanted to color, "was told that it wasn't time to color," and became so destructive that her therapist recommended taking her to the mental hospital.

Bella and Amelia were both currently seeing a trauma therapist and a behavioral therapist. Demus believed that the girls would need long-term mental-health treatment and counseling.

The evidence shows that Ms. Foster could appropriately meet the girls' present and future needs. Demus testified that

- Ms. Foster was good about discussing the girls' issues with Demus and the girls' therapists.

- Ms. Foster had been able to meet Bella and Amelia's emotional, developmental, physical, and financial needs and would be able to likewise meet their future needs.

- Ms. Foster ensured that the girls attended their trauma therapy and behavioral therapy.

- Ms. Foster wanted to adopt the girls if the parents' rights were terminated.

23

- The Department supported Ms. Foster's plan to adopt the girls if the parental rights were terminated.

- Demus believed that outcome would serve the girls' best interests.

Similarly, Ms. Foster testified that she would like to adopt the girls if their parents' rights were terminated, that the girls have a good relationship with the other two family members who live with her, and that she has been trained in trauma-informed care.

In contending that the evidence was insufficient to show that she could not adequately provide for the girls' present and future needs and that termination of her parental rights is in the girls' best interest, Mother relies on her compliance with her service plan—having employment, completing parenting and anger management classes, and completing counseling, drug assessment, and drug treatment. Of course, Mother had taken the same Department-offered services in the prior cases. She testified that previously she "did the services just to get by" but this time, she had "taken heed" and "listened." Demus agreed that Mother had completed her service plan.

As Mother contends, she testified that she had also engaged a life coach and financial advisor and additional counseling on her own. She was currently "learning how to be dependent on [her]self, . . . how to decipher and figure out what is abuse and what's not abuse, and just trying to be a better parent." Mother and Father both testified that in addition to the parenting classes included in their court-ordered

24

services, Mother voluntarily took a parenting class with Father focused on co-parenting.

However, despite Mother's completion of services, she was not yet stable enough to be responsible for the girls. She had repeatedly told Demus that she was going to get her own apartment. However at trial, Mother still lived with her sister in a Fort Worth apartment that she had told Demus was not appropriate for the girls. Mother testified that her sister's apartment was no longer inappropriate because the sister's teenagers had moved out and that she was open to a home visit by the Department, but there was no indication that Mother notified the Department of that change in circumstances before testifying.

More importantly, when her lawyer asked whether Mother was asking the court for an opportunity to prove that she could be a better parent, Mother testified that she "just need[s] a little more time":

> And I understand I've been saying I'm going to get this, I'm going to get that, but it's hard. It's very hard, and I'm out here by myself. So I have support—I have support, but . . . I've got to ask for it. That was my problem.

Finally, Father and Mother had historically had an on-again, off-again relationship. Demus was not certain they were really apart, especially after Bella voiced her concerns based on her observations during her Zoom visits with her parents.

Mother also showed a lack of focus on the girls' long-term well-being by not

planning for their futures. Mother waited until the second day of trial to ask her sister (Aunt) raising Mother's teenage son to be a placement option for the girls if they could not be returned home. Mother did not ask Aunt earlier because of her shame and embarrassment.

These factors weigh in favor of termination.

### c. Resolution

Mother relies on evidence that she completed her services, was employed, and had voluntarily completed extra services to improve herself to argue that the evidence is legally and factually insufficient to support the trial court's best-interest finding. However, as the factfinder, the trial court could have assigned a greater weight to (1) the evidence demonstrating Mother's endangerment of the girls by engaging in violence around them and by failing to protect them from Father's violence; (2) the fact that Mother and Father were not divorced, her recent run-in with Father, and Bella's suspicions based on her observations during Zoom visits that the parents were still together; (3) Mother's history of completing services under the Department's supervision but then returning to the same misconduct after the Department stopped watching her; and (4) the evidence of the girls' firm desires not to return to their parents again. *See Bush v. Bush*, 336 S.W.3d 722, 730 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("In a bench trial, the trial court is the sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, may accept or reject all or any part of their testimony, and resolves any conflicts or inconsistencies in the

26

testimony." (quoting *Rich v. Olah*, 274 S.W.3d 878, 884 (Tex. App.—Dallas 2008, no pet.))); *see also In re T.M.*, No. 02-19-00329-CV, 2020 WL 523272, at *7 (Tex. App.—Fort Worth Feb. 3, 2020, no pet.) (mem. op.) (citing same).

Having reviewed all the evidence according to the appropriate standards of review, *see J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 18–19, 28, we hold that the evidence is legally and factually sufficient to support the best-interest finding against Mother. We overrule her sole issue.

**B. Denial of Oral Motion for Continuance and Written Motion for Extension**

In his first issue, Father contends that the trial court abused its discretion by denying his motion for continuance or extension. We liberally construe this issue to challenge the denial of both motions. We review the trial court's rulings on both for an abuse of discretion. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002) (continuance); *In re J.P.-L.*, 592 S.W.3d 559, 575 (Tex. App.—Fort Worth 2019, pet. denied) (continuance); *In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied) (op. on reh'g en banc) (extension). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

On April 28, 2021, less than a week before the trial began, Father filed a Motion to Retain Suit on Court's Docket Pursuant to Supreme Court Emergency Order. In his written motion, Father requested the trial court to extend the dismissal date, which had already been extended once. He noted in his motion that the final trial was set for May 4, 2021, at 9:00 a.m., but he did not ask in that motion that the trial be continued.

On the first day of trial, all parties announced ready. Afterward, Father asked that the trial be continued when orally arguing his written extension motion to the trial court. The girls' attorney ad litem opposed both an extension and a continuance. The trial court denied both motions.

Father waived his motion for a continuance. An announcement of "ready" "waives the right to seek subsequently a delay based upon any facts which are, or with proper diligence should have been, known at the time." *Reyna v. Reyna*, 738 S.W.2d 772, 775 (Tex. App.—Austin 1987, no writ); *see Hammer v. Hammer*, No. 03-18-00028-CV, 2018 WL 4441588, at *7 (Tex. App.—Austin Sept. 18, 2018, pet. denied) (holding same); *In re J.C.*, No. 10-09-00370-CV, 2010 WL 1712705, at *1 (Tex. App.—Waco Apr. 28, 2010, no pet.) (holding same).

Even if Father had preserved his motion for continuance, the trial court did not abuse its discretion by denying it. Civil Rule of Procedure 251 provides that no continuance shall "be granted except for sufficient cause supported by affidavit, or by consent of the parties, or by operation of law." Tex. R. Civ. P. 251. A trial court

therefore generally does not abuse its discretion by denying an oral motion for continuance. *J.P.-L.*, 592 S.W.3d at 575; *In re M.A.-O.R.*, No. 02-11-00499-CV, 2013 WL 530952, at *5 (Tex. App.—Fort Worth Feb. 14, 2013, no pet.) (mem. op.); *see* Tex. R. Civ. P. 251. Similarly, we generally presume the trial court does not abuse its discretion by denying a motion for continuance that is unsupported by an affidavit. *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986); *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 226 (Tex. App.—Fort Worth 2009, pet. denied).

Father did not file a written motion for continuance or an affidavit supporting such motion, and the girls' attorney ad litem did not consent to a continuance. (Father does not argue that he was entitled to a continuance by operation of law.) Because Father did not comply with Rule 251 even if he preserved his complaint, we hold that the trial court did not abuse its discretion by denying Father's oral motion for continuance. *See* Tex. R. Civ. P. 251; *J.P.-L.*, 592 S.W.3d at 576.

The trial court also did not abuse its discretion by denying the extension. Family Code Section 263.401(b) allows the trial court to extend the dismissal deadline of a government-filed termination suit for "extraordinary circumstances" and only if it is in the children's best interests:

> Unless the court has commenced the trial on the merits, the court may not retain the suit on the court's docket after the time described by Subsection (a) unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child.

29

Tex. Fam. Code Ann. § 263.401(b). The focus is on the children's needs, "whether extraordinary circumstances necessitate the child[ren] remaining in the temporary custody of the Department, and whether continuing such is in the best interest of the child[ren]." *A.J.M.*, 375 S.W.3d at 604; *In re R.D.*, No. 02-21-00125-CV, 2021 WL 4204999, at *5 (Tex. App.—Fort Worth Sept. 16, 2021, no pet.). "Actions . . . considered to be the parent's fault will generally not constitute an extraordinary circumstance." *R.D.*, 2021 WL 4204999, at *5 (internal citations and quotation marks omitted); *In re E.F.*, No. 07-18-00281-CV, 2018 WL 4997785, at *1– 2 (Tex. App.—Amarillo Oct. 15, 2018, pet. denied) (mem. op.).

As grounds in support of his contention that the trial court abused its discretion by denying a second extension, Father lists, with little discussion:

- less than thirty days' notice of the Department's decision to seek termination;

- inadequate time to prepare for trial;

- no opportunity to engage in services;

- "the COVID-19 situation and the numerous Supreme Court's COVID Orders";

- the cancelling of family therapy; and

- the Department and Mother's support of the extension.

Father does not support his arguments with any legal citations. They are therefore inadequately briefed. *See* Tex. R. App. P. 38.1(i); *In re T.T.F.*, 331 S.W.3d 461, 477– 78 (Tex. App.—Fort Worth 2010, no pet.) (citing *Fredonia State Bank v. Gen. Am. Life*

30

*Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (noting long-standing rule that a point may be waived due to inadequate briefing)). Nevertheless, in the interest of justice, we note:

- The agreed order setting the final trial on May 4, 2021 had been on file since March 15, 2021, so trial notice was not a concern.

- The girls' ad litem pointed out in the pretrial discussion that Father had known "since forever" that the ad litem would be seeking termination.

- The petition sought termination, and the Department's lawyer stated in the pretrial hearing that in June 2020, the Department had announced its plan to seek termination.

- Even though Father sought family therapy in a March 2021 permanency review and the Department supported it and was open to reconsidering its position regarding returning the girls to Father depending on the results of family therapy, the girls' ad litem opposed family therapy absent support by the girls' therapist, who also opposed it. The judge presiding over the permanency review stated that because of the opposition, Father would need to file a motion for family therapy. Father did not file a motion for court-ordered family therapy until April 28, 2021, approximately six weeks after the permanency review and less than a week before the trial setting.

- The girls' ad litem argued in the pretrial hearing that family therapy would not serve the girls' best interest.

- In the March 10, 2021 permanency order, the trial court found that Father had "demonstrated adequate and appropriate compliance with the service plan," so there is no evidence that "the Covid-19 situation" justified an extension.

Father chose not to file his motion for court-ordered family therapy until less than a week before trial. The trial court could have concluded that Father's choice did not create an extraordinary circumstance under the statute. *See R.D.*,

2021 WL 4204999, at *5. Father also did not demonstrate that the additional extension served the girls' best interests. *See A.J.M.*, 375 S.W.3d at 604. Given the girls' removal from their parents lasting more than sixteen months in just this latest case and their therapist's and attorney ad litem's opposition to family therapy, the trial court could have concluded that extending the case on the docket again was not in the girls' best interests. *See A.J.M.*, 375 S.W.3d at 605 (noting that "statutory language prefers finality to suit"); Tex. Fam. Code Ann. § 263.401(b). We therefore hold that the trial court did not abuse its discretion by denying Father's motion for a second extension, and we overrule his first issue.

### C. Overruled Speculation Objection

In his third issue, Father complains that the trial court abused its discretion by overruling his objection that a question called for speculation and admitting the testimony. Father objected to the following testimony by Demus, the OCOK caseworker,[4] in response to the girls' attorney ad litem's question:

Q.          Okay. With regards to the visits [with the parents], do you think that if the visits—once the visits stop that the girls will do better?

[Father's Counsel]: Objection. Calls for speculation.

THE COURT:     Overruled.

A.          Yes. . . .

---

[4]Father mistakenly identifies the witness as Michelle Hall, the FBSS worker on the case from February 2019 until July 2019.

32

We review the trial court's admission of evidence for an abuse of discretion. *See In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005); *In re K.E.*, No. 02-20-00045-CV, 2020 WL 4360493, at *4 (Tex. App.—Fort Worth July 30, 2020, pet. denied) (mem. op.).

"[T]he Rules of Evidence are equally applicable to both Texas civil and criminal cases," and we may look to Texas criminal cases "for guidance in construing the Rules of Evidence in civil cases." *In re C.A.*, No. 02-21-00018-CV, 2021 WL 2753533, at *3 n.1 (Tex. App.—Fort Worth July 1, 2021, no pet.) (mem. op.). "An objection that a question calls for speculation is an objection that the question calls for an opinion outside the personal knowledge of the witness, and such an objection thus implicates [R]ules of [E]vidence 602 and 701." *Shelton v. State*, No. 2-07-392-CR, 2009 WL 672011, at *2 (Tex. App.—Fort Worth Mar. 12, 2009, no pet.) (mem. op., not designated for publication) (citing *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997)).

Rule of Evidence 602 allows a witness to "testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Tex. R . Evid. 602. That evidence "may consist of the witness's own testimony." *See, e.g., In re G.C.F.*, 2-06-282-CV, 2007 WL 1018570, at *5 (Tex. App.—Fort Worth Apr. 5, 2007, no pet.) (mem. op.) (holding mother who lived with father had sufficient personal knowledge under Rule 602 to testify about his noncompliance with his service plan).

Rule 701 requires that lay opinion testimony be "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Tex. R. Evid. 701. As our sister court in Tyler has explained in a termination case when addressing a challenge to testimony of a Department investigator about drugs and drug paraphernalia:

> As a general rule, observations that do not require significant expertise to interpret and that are not based on a scientific theory can be admitted as lay opinions if the requirements of Texas Rule of Evidence 701 are met. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002).
>
> Rule 701(a) has been said to have two elements. *Harnett v. State*, 38 S.W.3d 650, 657–58 (Tex. App.—Austin 2000, pet. ref'd). The first element involves the personal knowledge of the witness as required by Rule 602. *See id.* at 658; *see also* Tex. R. Evid. 602. The necessary personal knowledge may be gained by perception of fact by the senses of the witness. *Harnett*, 38 S.W.3d at 658. The second element mandates that the opinion must be one a reasonable person could draw from the underlying facts. *Id.* Under Rule 701, much must be left to the discretion of the trial court. *Id.*; *Austin v. State*, 794 S.W.2d 408, 410 (Tex. App.—Austin 1990, writ ref'd). If the witness perceived events and formed an opinion that a reasonable person could draw from the facts, the first part of the rule is met. *See Hayes v. State*, No. 06-06-00230-CR, 2008 WL 268641, at *5 (Tex. App.—Texarkana Feb. 1, 2008, pet. ref'd) (mem. op.). If the opinion is also helpful to the trier of fact to understand the witness's testimony or aids in the determination of a fact in issue, the opinion is admissible under Rule 701. *See id.*

*In re R.L.A., IV*, No. 12-12-00317-CV, 2013 WL 1092210, at *4 (Tex. App.—Tyler Mar. 15, 2013, no pet.) (mem. op.).

Father contends that the girls' attorney ad litem did not lay the Rule 701 predicate before the trial court admitted Demus's lay opinion, and he specifically

34

asserts that the trial court heard no evidence that the witness had personal knowledge of the matter, in violation of Rule 602, before her challenged testimony. We disagree.

The evidence shows that Demus had been the family's Department caseworker from March 2017 to June 2018 in a previous case and was assigned to the present case as the OCOK caseworker in April 2020. She therefore knew the girls and their parents.

The evidence also shows that Demus spoke with the girls about the visits, observed the visits, and witnessed their aftermath. Before the complained-of testimony, she testified on direct examination by the Department that she had been supervising the "visits for a lot of reasons" and had concerns about Bella's visits with her parents: "A lot of times, [Bella] do[es] not want to go. I have to encourage her, and she does come. A lot of times she'll ask me if she can leave. I have to encourage her to s[t]ay." Demus had last encouraged Bella to visit only the day before testifying. Demus also explained her concerns about Amelia's visits:

> A lot of times [Amelia] do[es]n't want to go. Like the day before, she doesn't want to go to the visit. She asks me [if] she has to go to the visit. And it's always yes. And a lot of times after the visit, she has these extreme meltdowns. Actually, about two Fridays ago, I drove over to Fort Worth just to calm her down. She had completely destroyed the [girls'] bedroom [at their foster home].

On cross-examination by Mother's counsel, Demus affirmed that she had earlier indicated that the girls had had some meltdowns before and after visits. On cross-examination by Father's counsel, Demus testified,

35

Q.     So how is it that you testified earlier that this temporary foster placement was meeting all of the [girls'] physical and emotional and mental health needs yet they're regressing? Does that give you concern?

A.     No. Because some of the things that [Amelia] was doing, she wants to do. Because some things she wants to do when you tell her no. Like color. She wanted to color, and she was told that it wasn't time to color, but she wanted to color. So I don't think that—and then a lot of [Amelia's] behaviors, too, [are] some of the things that—she do[es]n't want to go to the visit, so she'll create something so she do[es]n't have to go to the visit. So, I mean, that's just—it's [Amelia].

Q.     Okay.

A.     So I'm not saying that it's because of the foster home. It's just [Amelia] has been through a lot of things that . . . [are] in herself, and she hasn't had a chance to get them out.

Q.     You can't say it's as a result of being in the foster home, but also can't say that it's a result of anything from [Father] or [Mother]; right?

A.     Well, only what they tell me.

Q.     Only what who tells you?

A.     The girls. Both of the girls.

Later, Demus indicated that Amelia had been hospitalized after destroying the bedroom.

The evidence detailed above shows that Demus had personal knowledge of the girls, their parents, the visits, and the girls' feelings and behaviors surrounding the visits. She spoke with the girls, attended the visits, and saw the bedroom Amelia destroyed. Demus was therefore able to give a lay opinion rationally based on her own perceptions regarding whether the girls would "do better" with no visits with their

36

parents, and it was an opinion that a reasonable person could have drawn from the evidence and that the trial judge could have used in determining the girls' best interest. Consequently, we hold that the testimony complies with both Rule 602 and Rule 701 and that the trial court did not abuse its discretion by overruling Father's objection and admitting the testimony. *See In re Commitment of Allen*, No. 05-20-00079-CV, 2021 WL 688449, at *7 (Tex. App.—Dallas Feb. 23, 2021, no pet.) (holding sex offender's testimony regarding the risk of his reoffending in the future was admissible lay testimony); *R.L.A., IV*, 2013 WL 1092210, at *4 (holding that counsel was not ineffective for failing to object to investigator's testimony as inadmissible expert testimony or for failing to request a *Daubert* hearing because the testimony that the investigator helped the police with a drug raid and saw a baby alone on the bed surrounded by drugs was admissible lay opinion testimony). We overrule Father's third issue.[5]

## III. CONCLUSION

Having overruled Father's three issues and Mother's sole issue, we affirm the trial court's judgment.

---

[5]Father titles the discussion of his third issue "Objection to Hearsay Overruled." To the extent he intended to complain of hearsay, we overrule that complaint as inadequately briefed. *See* Tex. R. App. P. 38.1(i); *T.T.F.*, 331 S.W.3d at 477–78.

               /s/ Mike Wallach
               Mike Wallach
               Justice

Delivered: December 9, 2021